**UNITED STATES of America**

v.

**Walter H. JONES and Peter Moraites, Defendants.**

**Crim. A. No. 597–71.**

United States District Court,
D. New Jersey.

Feb. 4, 1974.

---

Herbert J. Stern, U. S. Atty. by Jonathan L. Goldstein, First Asst. U. S. Atty., Lawrence S. Horn, and David R. Hinden, Asst. U. S. Attys., for plaintiff.

Williams, Connolly & Califano by Edward Bennett Williams, Robert L. Weinberg, and Robert P. Watkins, Washington, D. C., for defendant Walter H. Jones.

Isles & Weissbard by Harvey Weissbard, Montclair, N. J., for defendant Peter Moraites.

WHIPPLE, District Judge:

This Court has had the benefit of an 18 day trial filled with voluminous testimony sharpened by expert direct and cross-examination and with eloquent and exhaustive oral argument. It has also received meticulous briefs and proposed findings of fact and conclusions of law from both the government and defense which press upon this Court the guilt or innocence of Walter H. Jones and Peter Moraites.

In essence Walter H. Jones and Peter Moraites have been accused of conspiring between themselves and with others to defraud the Englewood National Bank and Trust Company (Englewood) and its shareholders through a merger consummated in August of 1968 with Midland Bank and Trust Company (Midland). They also are accused of entering into a further conspiratorial scheme to defraud the shareholders of the newly merged bank in February 1969 incident to a recapitalization program. Both charges arise from an alleged failure to disclose and an alleged attempt to deliberately conceal the true status of ship loans on the books of the bank.

In particular Walter H. Jones is charged in Count 1 of the indictment, returned by a federal grant jury on August 25, 1971, of a conspiracy to violate 18 U.S.C. § 1341 (mail fraud), § 1343 (fraud by wire), 15 U.S.C. § 78ff(a) (penalty provision of the Securities and Exchange Act, 78(j) (manipulative and deceptive devices) and 17 C.F.R. 240.-10b–5 promulgated thereunder and 18 U.S.C. § 1007 (Federal Deposit Insurance Corporation transaction). Count 2 charges a violation of the Securities Act. Count 3 charges the use of the mails to carry out the alleged scheme. Counts 4, 5, 6, 13, 14 and 16 charge mail fraud predicated on letters sent to or from Raymond Wessner, Deputy Commissioner, New Jersey Department of Banking and Insurance. Count 9 charges a conspiracy (18 U.S.C. § 371) to violate the Securities Act. Count 10 charges the substantive offense of violating certain provisions of the Securities Act. Counts 11 and 12 are predicated on a letter and enclosures sent to the stockholders of the Midland Bank and Trust Company, allegedly violative of 18 U.S.C. § 1341.

Peter Moraites stands charged with the same Counts of the indictment except a judgment of acquittal was entered as to him on Counts 7, 9, 10, 11, 12, 13, 14, 15 and 16 on October 29, 1973.

Judge Garth also dismissed Count 8 of this indictment as to both defendants on April 24, 1972 and this Court dismissed Count 7 of the indictment as to defendant Jones at the close of the government's case in chief on October 29, 1973.

Before this Court will address itself to the remaining Counts of the indictment outstanding as to both defendants, a controlling question of law must be analyzed and answered. Both in their briefs, delivered to the Court at the conclusion of the government's case in chief and at the conclusion of defendant Jones' case in chief, and in letters addressed to this Court on November 20, 1973 and November 26, 1973, the defendants and the government locked issue on the question of fraudulent intent. As I read the letters and briefs, it becomes apparent that the argument between the parties primarily centers on what weight the apparent absence of an actual injury in fact, in terms of loss of money or property, for the stockholders of the Englewood and Midland banks, is to have on the outcome of the case.

Initially no one seriously argues that the government need not show fraudulent intent to obtain a criminal conviction under the Securities Act, Rice v. United States, 149 F.2d 601 (10th Cir. 1945); Troutman v. United States, 100 F.2d 628 (10th Cir. 1938); United States v. Benjamin, 328 F.2d 854 (2d Cir.) cert. denied 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964), especially when it is yet seriously debated that such fraudulent intent is a prerequisite in proving even civil liability under the Act. Fishman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Weber v. C.

M. P. Corp., 242 F.Supp. 321 (S.D.N.Y. 1965); [1] Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir. 1972). There also can be no argument that the government need not prove that anyone was defrauded nor that investors suffered loss when prosecuting an indictment for mail fraud or securities fraud. Farrell v.. United States, 321 F.2d 409 (9th Cir. 1963), cert. denied 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1964); Bobbroff v. United States, 202 F.2d 389 (9th Cir. 1953); United States v. Interstate Engineering Corp., 288 F. Supp. 402 (D.N.H.1967). If the defendants seek to move this Court to adopt a contrary argument, they have failed to do so.

The factual proof of injury is not irrelevant, however, to the government's successful prosecution of its case. Although it need not establish that actual injury occurred to make out a case of securities or mail fraud, the actual presence or absence of such injury does supply a factual foundation from which this Court can infer whether the defendants comported themselves with the fraudulent intent necessary for conviction under the Counts charged in the indictment. It is in this light, then, that the apparent absence of any actual injury in fact will be considered.

Further, it is clear to this Court that the government bears the burden of establishing the presence of fraudulent intent in these defendants beyond a reasonable doubt. Sitting now as trier of fact with 18 volumes of testimony and over 120 exhibits for the government and defense before me, I must find the defendants Jones and Moraites innocent, if I am unable to find, after drawing all inferences as consistent with their innocence as is reasonably probable, that they have committed the acts as charged in the indictment. Because I am now sitting as trier of the facts and because I am under an obligation to set forth a factual record on which I will base my ultimate legal conclusion of guilt or innocence I find:

Walter H. Jones and Peter Moraites have been political allies and friends since the 1940s. They became involved in a business relationship in 1958 when the Midland Bank was chartered. Peter Moraites was an original member of Midland's Board of Directors and Walter H. Jones was the bank's general counsel.

In fulfilling his role as a member of the Board, Peter Moraites, like others, was expected to bring business into the bank. Moraites was an attorney specializing in Maritime Law and naturally sought business for the bank in an area he knew best, ship financing. These loans were looked upon by him and others as lucrative and a good investment for the bank because they commanded a rate of interest higher than other commercial loans.

The first series of these loans were made in 1963 and 1964 in participation with New York banks that were specialized in this area. Subsequently, Midland began to make these ship loans on its own. The Midland Bank adopted an internal procedure whereby the Board of Directors established a ceiling which generally limited the overall amount of bank funds that could be extended in this type of lending and gave authority whether by formal resolution or custom, to President Pensec and Director Moraites to grant and approve shipping companies applying for these loans. This was an exception to its settled policies of having all loans of $25,000. or more, directly approved by the Board of Directors. The Board relied upon Pensec and Moraites to administer these loans efficiently.

1. The Second Circuit's classic development of this problem in S. E. C. v. Texas Gulf Sulpher Co., 401 F.2d 833 (1968), cert denied 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) seems to relax the requirement of proof of fraudulent intent only when an injunction is sought by the S.E.C. and not for private civil remedies under the Act. See the strong concurring opinion of Judge Friendly and the subsequent case of Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968).

Some of these loans were made to ship companies owned by George Bacalakis totalling $375,000. In mid 1966, Bacalakis was experiencing financial trouble and Peter Moraites arranged for a take-over of these loans by K & M Ship Brokers Ltd. owned by John McTaggert and John Katsoulakis who personally guaranteed the Bacalakis debt. K & M were experienced operators in the shipping business and considered a good credit risk by Midland and the Franklin National Bank in New York City, that specialized in Maritime loans. Midland extended $1,700,000. to these operators through the year 1967.

In 1966 and 1967, thought was given to merging Midland with Englewood. Walter H. Jones, who always had been an investor in banking stock, and was a principal shareholder in the Midland bank both personally and through the instrumentality of Hoke, Inc., a corporation in which he owned a one-third interest, began to buy up shares in the Englewood National Bank in street name. This was done both because the stock in a merged and expanded bank was considered a good investment and because the ownership of this stock would enable him to insure that a merger would be accomplished.

The actual discussions which brought about the merger of the two banks and solidified the agreement between them were carried on by Donald Salmon and John Pensec on behalf of Midland, and by Joseph Skaller and Thomas Stagnitti, on behalf of Englewood. Salmon and Pensec were, respectively, the Chairman of the Board and President of Midland. Skaller and Stagnitti were, respectively, the Chairman of the Board and the President of Englewood. Ultimately an Agreement of Merger was drafted by Messrs. Weisenger, Liebowitz and Klinger, attorneys for the banks. Their aid was solicited because Walter Jones was general counsel for both banks and because Jones had been specifically excluded from the merger negotiations by Skaller.

Under the terms of the Agreement of Merger, stockholders of Midland and Englewood would each receive one share of stock in the merged bank in exchange for each share which they had held in Midland and Englewood. The Agreement of Merger provided for each party to make two further financial disclosures to the other party subsequent to the Agreement's execution: audited financial statements prepared by the certified public accountants of the respective banks were to be exchanged "in due course" and "cold comfort letters" prepared by such accountants were to be exchanged prior to closing. The Agreement of Merger provided that the audited Statement of Condition of Midland would be as of January 8, 1968, and that the audited Statement of Condition of Englewood would be as of November 4, 1967. No date was specified for the exchange of these Statements of Condition, but they were required to be submitted "in due course". The "cold comfort letters" had to cover the period from January 8, 1968 in the case of Midland, and November 8, 1967 in the case of Englewood, until the date ten days prior to the closing date. The closing date was subsequently set for August 16; accordingly the "cold comfort letter" covered the period up to August 6.

The Agreement of Merger contained no further provisions for exchange of financial information. Rather the Agreement of Merger provided that:

> The agreement represents the entire understanding between the parties hereto covering the subject matter hereof, and may not be amended or altered except in writing by the parties hereto, and there are no undertakings except as herein set forth.

Therefore, the parties were contractually obligated to provide each other with the two disclosures of financial information specified in the Agreement of Merger, namely the audited Statements of Condition and the "cold comfort letters".

Problems arose concerning Midland's audited Statement of Condition. On

January 12, 1968, Raymond Perry, a partner of the firm of E. R. Burt and Co., who were the official auditors for Midland, informed John Pensec that he could not provide Midland with a "clean" letter of audit and that he would have to take exception to certain of the ship loan files because of a lack of documentation. Pensec immediately phoned Walter Jones who summoned him and Perry to a meeting in his office. Jones was greatly upset at hearing of Perry's findings and ordered Marvin Gladstone, an associate in his law office, to return to the bank with Perry on the following day and to ascertain whether the status of the ship loan files was as uncollateralized as Perry reported. Jones also called Peter Moraites and told him to bring whatever documentation he may have had for these ship loans to the bank on the following morning.

The investigation of the next morning provided no new information and it was decided that Marvin Gladstone should go to London and obtain whatever was necessary from K & M in order to regularize their loan files. Jones, with the help of Peter Moraites, called ahead to London in order to prepare K & M for Gladstone. Perry agreed to withhold his findings until Gladstone's return so that Midland would be able to cure the defects before his report went out. From this day forward Walter Jones exercised control over the administration of Midland's ship loan file.

Gladstone called Perry from London, indicated he had the necessary documentation and as a result, Perry's clean audit report went out. When Gladstone returned, however, Perry discovered Gladstone did not have mortgages but irrevocable undertakings to mortgage. Perry relied on Gladstone's representation, however, that these were legal equivalents and issued a short form audit report dated January 8, 1968. This report was sent to both banks on January 25, 1968. It was not until February of 1968 that mortgages were obtained to collateralize these loans when Constantine Georgiopolos, a law associate of Mo-

raites at the New York firm of Hill, Betts, Yamaoka, Freehill and Longcope, returned from London and presented them to Pensec at the Midland bank for his signature. Afterwards they were sent by Georgiopolos to a Panamanian correspondent for recordation.

Accompanying these mortgages was the February 22, 1968 addendum to a paydown agreement executed in January by Marvin Gladstone on behalf of Walter Jones for the Midland Bank. This paydown agreement was a contractual assurance that any notes or mortgages would not be acted upon or reduced to judgment as long as K & M adhered to the schedule of payments outlined in the paydown agreement, i. e., $50,000. in January; $50,000. in February; $50,000. in March; and $25,000. a month thereafter until the outstanding principal and interest on the loans had been liquidated. Thus it was not until Georgiopolos returned from London in February of 1968 that the loans to K & M were fully collateralized.

On March 27, 1968, a longer and more detailed audit report was issued by E. R. Burt & Co. in which it specially noted the Midland Bank's ship loan files as having lacked proper credit information and/or collateral documentation when they were initially reviewed and recommended that the Bank liquidate these loans and forego such business in the future or maintain them only in participation with other banks fully experienced in this specialized field. This report, like the previous report of January 8, 1968, was transmitted to Englewood as part of the information to be exchanged in anticipation of the merger and was also discussed by a quorum of the Midland Board of Directors on April 29, 1968.

Over Memorial day weekend, Jones and Moraites travelled to Greece and executed renewals of the K & M notes. At the same time Jones signed a letter drafted by Katsoulakas reaffirming the terms of the January paydown agreement. This enabled Midland to report to the Federal Deposit Insurance Corpo-

ration (F.D.I.C.) on July 12, 1968 that all of its ship loans were current with one minor exception that the total balance outstanding on these loans had been reduced by $327,508.

This report was necessary because the F.D.I.C. had originally objected to the merger as the result of an investigation by Thomas Spillane in April of 1968. Mr. Spillane criticized the overconcentration of Midland's assets in ship loans and the lack of managerial control over the administration of the ship loan files. These criticisms echoed the observation of the New Jersey Department of Banking in a letter addressed to the Midland Board of Directors on July 21, 1967. The Midland Bank responded to these criticisms of the New Jersey Department of Banking through a communication addressed to it by Pensec in 1967 and on February 29, 1968, a resolution of the Board of Directors was passed refusing to extend any new ship loans until the present loans outstanding had been liquidated. These K & M payments were indicative of this newly adopted policy and it satisfied both the New Jersey Department of Banking and the F.D.I.C., so that the merger was approved on July 17, 1968. There is no doubt that Walter Jones was particularly instrumental in obtaining these payments and in shaping the new policy of the Midland Bank and this was recognized in memoranda both by the New Jersey Department of Banking and the F.D.I.C.

In July of 1968 neither the Midland Bank, the F.D.I.C., the New Jersey Department of Banking, Walter Jones nor Peter Moraites seriously doubted the ultimate collectability of these loans. To be sure, Jones had been informed by a Mr. Mastronardo of the Franklin National Bank on July 12, 1968 that for the next two months K & M were in dire financial straits but Mastronardo indicated that this was a temporary situation and expected that K & M should get by. In any event, both he and Jones recognized there was a $3,000,000. cushion between K & M's total outstanding indebtedness and their current assets. They both agreed that they should meet soon and work out a joint approach to the payment of their respective loans. Although, given the aid of hindsight in view of what ultimately occurred, this might seem an ominous development revealing the uncollectability of the Midland loans, this prescience is not revealed in the testimony. Both Mastronardo and Jones appeared cautiously optimistic.

On August 12, 1968, "cold comfort letters" were to be exchanged between the Midland and Englewood Banks pursuant to the Agreement of Merger. Raymond Perry reviewed the Midland Board's minutes between January 9, and August 6, 1968 in which the major difficulties and subsequent resolution of the problems in the ship loan file were discussed and detailed. Perry reviewed these minutes as well as the F.D.I.C. and the New Jersey Banking Department's audit and expressed his pleasure at the progress that the bank had made.

Before he would issue his cold comfort letter, Perry requested a representation letter from Pensec declaring that there had been no adverse or material changes in the bank's condition since the date of the original audit in January of 1968. Pensec refused to sign this letter unless it incorporated some changes in its language. Perry refused to issue the cold comfort letter until Pensec signed it. The letter was finally issued by Perry after Jones advised him that the document would be signed by Pensec and that this letter of representation and the cold comfort letter would cross in the mails. Pensec never sent his representation letter although he indicated he had done so to Walter Jones and had incorporated the changes of language that he had desired.

The merger between the two banks was consummated on August 16, 1968. At the closing Pensec furnished Englewood's representatives with a certificate sworn to by him which contained the very language he objected to in the cold comfort letter. The cold comfort letter,

which also was supplied to Englewood at this closing, also contained explicit reference to the March 27, 1968 audit report that specially noted Midland ship loan portfolios and the specific problem of lack of documentation that existed in these files at the time of the January 8, 1968 audit. This report also noted the undesirability of ship loans for a bank as inexpert in this area as Midland.

There is no doubt in my mind that this cold comfort letter was read by the Englewood accountants present at the closing nor can I doubt that this reference was understood by them. If the March 27, 1968 report had not been received by Englewood, clearly objection would have been raised at a meeting as crucial as this. This court concludes then that the March 27, 1968 report was received and read by the Englewood Bank prior to the August 16, 1968 closing.

On September 23, 1968, the Executive Committee of the newly merged bank met and was given a general review of the Midland Bank's activity in ship loans by President Pensec and Director Moraites. Subsequently there was a meeting of the newly constituted Board of Directors on October 21, 1968. At that meeting, it was discovered that the K & M loans were approximately $80,000. in arrears on interest due to the bank. This was a $70,000. increase since August and Walter Jones, along with Peter Moraites, had been instructed by the Executive Committee on October 14, 1968 to travel to London in an attempt to bring these loans up to date.

Jones and Moraites did travel to London in October of 1968 and attempted to enter into a joint work-out agreement with the Franklin National Bank, which, like Midland, considered the loans viable until this point in time. The upshot of the October conference in London was that Midland was not included in K & M's October work-out agreement with Franklin National.

In November 1968, Jones communicated his fear that there would be possible losses in the ship loan portfolio of over $1,000,000. to members of Midland's Board of Directors. He also informed Deputy Commissioner Wessner of the New Jersey Department of Banking of these possible losses and indicated that he would personally keep him informed of all developments if his Department would approve a recapitalization program to offset these imminent loan losses.

Subsequent to hearing this news, the former Directors of Englewood, now on the newly merged Board, were disturbed and met to discuss possible ways of rescinding the merger. They concluded, however, that there were no legal recourses available to them and they would have to ride out the situation with the Midland Bank.

During this period from October 29 to December 20, 1968, the F.D.I.C. and the New Jersey Department of Banking were making a complete review of Midland's ship loan files. On December 23, 1968 the Midland Bank was ordered by the Department of Banking to either charge off these loans or to specifically set up a reserve in the amount of $1,700,000. to offset possible ship loan losses. The Midland Board of Directors complied with this request by resolution on December 26, 1968 and charged off $695,121.35. as loan losses and established a reserve of $1,000,000. This was reflected in the December 31, 1968 Statement of Condition by deducting this $1,000,000. reserve from Loans and Discounts in the Assets column. This was a conservative, but normal, banking procedure and it became the Statement of Condition that was mailed in January 1969 to the Midland stockholders in connection with the new stock issue for Midland's recapitalization program. In fulfillment of his promise to Deputy Commissioner Wessner, Walter Jones delivered this Statement of Condition and other proxy material to him for his personal approval before sending it out to the Midland stockholders. This material was also sent to the F.D.I.C., although

its approval was not required in the recapitalization program.

The Midland recapitalization program entailed the raising of $2,200,000. in new capital. The Midland stockholders, in exercise of their pre-emptive rights, were entitled to purchase one share of stock for every two shares they presently owned. These warrants were to be exercised and returned to the bank with the full subscription price of $20. per share no later than February 10, 1969. The Statement of Condition discussed above accompanied the mailing of these warrants in January 1969, along with other proxy materials. A different accounting of the December 31, 1968 Statement of Condition was published on January 19, 1969 in the Paramus Post which specifically noted that "Loans as shown in item 7 of assets are after deduction of valuation reserves of $1,106,110.08."

There was some concern among the Midland Board of Directors concerning the adequacy of the disclosures made in this Statement of Condition in connection with the stock issue and it was evidenced by a letter written by John Pensec to Walter Jones on January 21, 1969 at the urging of Donald Salmon, a member of Midland's Board of Directors. Specifically, he was concerned that reasons for the necessity of recapitalization, i. e., the ship loan losses, had not been sufficiently disclosed to the stockholders and/or the public and he wished Jones' legal opinion, as Bank Counsel, concerning the adequacy of the disclosure already made.

Jones sent a copy of this letter with his accompanying response to Deputy Commissioner Wessner at the Department of Banking for his information and comments. He directed his response, however, to Donald Salmon rather than John Pensec because Pensec was presently in Athens attempting to negotiate a new work-out agreement with K & M. Jones wrote that he was counsel to the Bank and not to specific individuals on the Board of Directors and that

he would not deliver such an opinion until requested to do so by the entire Board.

The question was specifically raised at a special meeting of the Board called by Donald Salmon on February 19, 1969. At that meeting Jones said that the Bank was under an obligation to make full disclosure but that at the same time the Board had to exercise its discretion in determining what would satisfy the legal demands of full disclosure and not unnecessarily jeopardize the business interests of the bank. He indicated also that if some members of the Board of Directors had information concerning the ship loans or other matters which was not available to their fellow Board Members and which reflected a different Statement of Condition of the Bank than the one previously disclosed in the proxy material, they were under an affirmative obligation to come forward now, inform the other members of the Board or be subject to future personal liability for their failure to do so. As to the sufficiency of the December 31, 1968 Statement of Condition and the disclosure of the difficulties in Midland's ship loan portfolio, Jones read a letter dated February 5, 1969 from Deputy Commissioner Raymond Wessner who informed him:

> We are satisfied that the Statement of Condition as published by the bank as of December 31, 1968, reflects its true condition as of that date. Furthermore, there does not appear to be any legal reason why these ship loans should be explained to the stockholders in the pending sale of additional capital unless the two directors referred to by Mr. Pensec have some positive information which was not disclosed at the time of the examination that would warrant additional charge-offs at this time.

This ended the debate and no further request was made of Jones concerning his legal opinion.

The new stock issue was successful. Eighty per cent was subscribed to by

Walter Jones and the Directors on the Midland Board.

In June 1969, Midland Bank was directed once again to set up a reserve for possible ship loan losses. The amount was $1,550,000. The assets of the Midland Bank have continuously increased since 1969. In February of 1969, the assets of the Bank were at $40,000,000. and at present they are $65,000,000. There also has been a 15 per cent accretion in the value of the shares purchased in 1969 at $20 per share.

In concluding these findings of fact, the Court wishes to restate the burden under which the government labors in this case. It must convince this Court beyond a reasonable doubt that Walter H. Jones and Peter Moraites have committed the offenses with which they have been charged. As presented, the facts must preclude any other hypothesis than that of guilt. Graceffo v. United States, 46 F.2d 852 (3rd Cir. 1931).

A constituent element running throughout the offenses charged in the indictment is that Walter Jones and Peter Moraites acted with fraudulent intent with respect to the merger of Midland and Englewood Banks in August of 1968 and with respect to the recapitalization issue of stock for the Midland Bank in February of 1969. In particular, the government charges that Walter Jones and Peter Moraites deliberately concealed the status of Midland's ship loan files from Englewood and that Walter Jones deliberately concealed the future loss of an additional $1,550,000. in bad ship loans from potential subscribers to the 1969 recapitalization stock issue.

In assessing the liability of Jones and Moraites on the merger counts, it becomes imperative to discuss the import of E. R. Burt & Co.'s March 27, 1968 report and Statement of Condition of Midland Bank as of January 8, 1968. This report specially noted Midland's ship loans and disclosed the lack of documentation that existed in these files on January 8, 1968. This report read:

We noted that *virtually all the ship loans reviewed lacked proper credit information and/or collateral documentation, therefore we classify all these loans as special mention.* In view of the fact that ship loans are a highly specialized banking function, best handled by institutions equipped for such loan functions, *we recommend that the Bank make every effort to liquidate these loans and forego such business in the future* or at the very least participate in such loans with an institution thoroughly experienced in the field. (Emphasis supplied)

The disclosures contained in this report were clearly enough to place Englewood on notice of the content of Midland's ship loan files and to inform them that these loans should not be handled by a bank of Midland's status.

It is this report that John Pensec originally testified he had been told by Walter Jones to conceal from the Englewood Bank. On cross-examination, however, he ultimately admitted that the report had been sent to the Englewood Bank.

John Pensec was the government's chief witness in establishing the criminal culpability of Walter Jones. At numerous points throughout his testimony he recounted how Walter Jones schemed along with him and others to conceal pertinent information in the ship loan files from Englewood and to dupe it into merging its capital with the soon to be depleted resources of the Midland Bank.

This Court has been troubled by the credibility of the government's chief witness. In the course of the trial, the defense elicited from John Pensec that he previously had engaged in professionally irregular, if not unsavory, conduct. He admitted that in his capacity as President of the bank, he had approved a loan for one Ira Feinberg when he knew that Feinberg was acting as a front for a Mr. Quinn to whom the bank previously had refused to lend the amount in question because it considered him a poor credit risk. Further Pensec

attempted to conceal the irregularity of this loan to Quinn by having his wife endorse the check which had been given to Feinberg in her maiden name and then it was she who purportedly delivered the money to Mr. Quinn. Mr. Pensec also admitted providing a false statement of net worth to the F.B.I. in 1969 by listing notes payable in the amount of $11,500., when in fact $10,000. of that amount had not been borrowed nor had the total indebtedness ever been evidenced by any notes. He also admitted communicating falsehoods to the New Jersey Department of Banking when in November of 1967, he incorrectly misstated the total amount of ship loans outstanding at the Midland Bank by $1,000,000. and ascribed the source of that error to subordinates. In August of 1967, however, Mr. Pensec assured the Department of Banking that the Midland Bank would not be making any new ship loans when in fact he had been authorizing new loans at the rate of 20 to 25 a month. There could be no error ascribed to subordinates in making this misstatement since, along with Moraites, he alone had authority to process these loans. For these reasons and because of other discrepancies in the transcript where Pensec's testimony contradicts the testimony of Hamilton and Georgiopolos, witnesses the Court has no reason to doubt, the testimony of Pensec is discredited when he speaks of Jones' continued scheme to conceal the March 27, 1967 report of E. R. Burt & Co. It is also inconceivable to this Court that the accountants and attorneys for Englewood would be so silent at the August 16th closing at which they received a cold comfort letter that makes such explicit and specific reference to the March 27th report if they had not received nor analyzed it.

■ Walter Jones can only be convicted of fraud with respect to the merger of the two banks if in August of 1968, he had knowledge of circumstances with regard to the ship loans or any other matters of the bank's business which would reveal that the March 27th report

was inaccurate. The record fails to disclose any such knowledge in Walter Jones. In August, 1968 he knew, as a result of a conversation with Mastronardo, that K & M would experience difficulty in meeting their payments to the Midland and Franklin National Banks during the summer months. But he also knew that since January Midland's position on the K & M ship loans had improved. Midland now had proper collateral documentation, a paydown agreement whose terms were being met and a reduction of the outstanding K & M debt by $327,000. He also agreed with Mastronardo that, after the summer difficulties, these loans in all probability would eventually be repaid because K & M were good operators. In hindsight, it is apparent that Walter Jones and the Midland Bank were overly optimistic but no doubt this was due, and understandably so, to the enormous improvement that had occurred in this area since Raymond Perry's devastating criticism of the ship loan files in January of 1968. For this reason, this Court finds that a judgment of acquittal must be entered for Walter Jones on Counts 1, 2, 3, 4, 5 and 6 of the indictment.

Peter Moraites must also be acquitted of the charges in the indictment remaining against him. As my findings of fact reveal, Peter Moraites' role in the transactions leading up to the merger is neutral or tenuous to say the least. He was responsible for obtaining ship loan clients for the Midland Bank, perhaps negligent in supervising and administering the ship loan files, although it is not clear whether it was his obligation to do so, but in any event, there are no events in this record to cause this Court to find him guilty as charged.

In the remaining counts of the indictment, Walter Jones is charged with failing to disclose information material to the recapitalization issue in February 1969. In particular the government charges that Walter Jones failed to disclose in the proxy materials he prepared: (1) that the ship loan losses of the previous year prompted the recapitalization

program; (2) that a further loss of $1,550,000. was expected in the ship loan portfolio.

With respect to the first of these particulars, Walter Jones interposes his good faith reliance on the February 6, 1969 letter from Deputy Commissioner Wessner which informed him and the Midland Board of Directors that the proxy materials previously prepared by Jones were an adequate and fair disclosure of the Midland Bank's present financial condition and that no specific information concerning the reasons that prompted the recapitalization program need be disclosed to potential stockholders. Although his good faith reliance is not sufficient, as a matter of law, to exculpate Walter Jones from liability arising under the Securities Act, nonetheless it provides sufficient evidence as a matter of fact to negative fraudulent intent. This conclusion is given further support by the lack of concealment which surrounded the preparation of this proxy material and the serious questions concerning its sufficiency by some Midland Directors. If Walter Jones were involved in a clandestine attempt to dupe both the Midland Board and its stockholders concerning the sufficiency of the proxy disclosure, it does not seem reasonable to this Court that he would have caused the correspondence, concerning its sufficiency and the minutes of the Board meeting at which he defended the adequacy of the proxy materials, to be sent both to the New Jersey Department of Banking and the F.D.I.C.

As to the second leg of the failure to disclose with respect to the recapitalization issue, i. e., that another $1,550,000. in losses was expected in the ship loan files, there is no evidence in the record from which the Court can conclusively infer that Walter Jones had such knowledge in February 1969. To be sure, Jones testified that he threw in the tow-

el with respect to the collectability of the K & M loans after the second workout conference failed in Athens in February of 1969. It was Robert Hamilton who claimed more specific knowledge concerning these anticipated ship loan losses but he failed to detail his specific fears when pressed to do so by Walter Jones at the February 17, 1969 Board meeting. Because this attempt by Jones to elicit specific information from Hamilton, which would demand the revision of the January prospectus, may easily be judged a good faith effort by him to obtain knowledge both for himself and the Board that would obligate them to further disclosure, this Court is unable to say beyond a reasonable doubt that Jones possessed the requisite knowledge to formulate fraudulent intent with regard to the recapitalization issue. This knowledge of material facts, essential to adequate disclosure, must be clear and not equivocal for this Court to conclude that Walter Jones is guilty of Securities fraud and for this reason a judgment of acquittal will also be entered for Walter Jones on Counts 9, 10, 11, 12, 13, 14, 15 and 16 of the indictment.

Having come to this conclusion, however, I think it necessary to say with Judge Learned Hand, in United States v. Weissman, 219 F.2d 837, 841 (2nd Cir. 1955), that I should not be understood to commend the conduct found here which Walter Jones himself described as "irregular". The propriety of that conduct may be one thing, whether it is sufficient to demonstrate guilt beyond a reasonable doubt under the strict standard applicable in criminal cases is another. For this reason, Walter Jones cannot be convicted of the crimes charged in the indictment.

This Opinion shall constitute the Court's findings of fact and conclusions of law, as well as its order entering a judgment of acquittal for Walter H. Jones and Peter Moraites.[2]

2. Because of the disposition of this indictment on the merits, the Court considers defendants' motions for dismissal of the indictment practically mooted and because of this, will not rule upon them.