## UNITED STATES v. PARELIUS.
### Cr. No. 10206.

United States District Court
D. Hawaii. First Division.

April 28, 1949.

Ray J. O'Brien, U. S. Atty. Dist. of Hawaii, and Howard K. Hoddick, Asst. U. S. Atty., Dist. of Hawaii, both of Honolulu, T. H., for plaintiff.

Bouslog & Symonds, and Myer C. Symonds, all of Honolulu, T. H., for defendant.

METZGER, Chief Judge.

The defendant was found guilty of murder in the first degree without capital punishment, and has moved to set aside the verdict, with prayer for a new trial, on several grounds, among which are that the verdict is contrary to the weight of the evidence; not substantiated by sufficient evidence of premeditated design and malice; that the court erroneously refused the introduction of evidence regarding the character of the deceased, and that at least two members of the jury, which was not instructed that a verdict of first degree murder makes mandatory a punishment not less than life imprisonment, offer affidavits that they believed the court had power to determine punishment and had they been informed that the court has no discretion in the matter of punishment for first degree murder they could not have voted such verdict, but would have voted a lesser offense.

After hearing full and carefully prepared argument on the motion, which argument was limited by the court to the sufficiency and weight of evidence justifying a verdict of first degree murder, I am of opinion that the motion has sufficient merit to justly sustain it.

The defense had asked at the trial for an instruction by the court that the defendant was not guilty of first degree murder, but this request was denied under the principles set out in Pierce v. United States, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542. The jury was instructed that if it found murder in the first degree the punishment provided by law was death if such verdict was returned without qualification, but it was not instructed that if it qualified such verdict with the words, "without capital punishment", the court was then bound by the law, and without discretion, to pronounce a sentence of life imprisonment.

It is true, generally, that it is not the province of the jury to concern itself as to the degree of punishment, that being a matter either provided by law, or left to the discretion of the court, however, in the case of murder in the first degree where the jury is told by the court that it must in its verdict decide the question whether or not death sentence should be imposed, there remains an inference, in the absence of information as to a mandatory penalty, that if it decides against death penalty the court has power to then use its discretion in the matter of the term of imprisonment.

True, there is an element in first degree murder that is not contained in lesser degrees of homicide, namely, an unlawful, willful, deliberate, malicious and premeditated killing, and it conforms to the dictates of reason to suppose that if a jury concludes that a homicide was of such a kind it follows that it must be convinced it was murder in the first degree; however, it

must be conceded that the simple definition of murder: "unlawful killing of a human being with malice aforethought", is not readily distinguishable from that of first degree murder, although the law says that any murder which does not contain all the ingredients first above mentioned is murder in the second degree. Experience has shown that juries are many times perplexed in reaching a decision as to first or second degree and distinguishing the shades of meaning between "unlawful killing * * * with malice aforethought" and "unlawful, willful, deliberate, malicious and premeditated killing".

■ From later careful consideration of all the evidence in the case I reach the conclusion that this was not first degree murder. I could not at the time of settling instructions feel free to so instruct the jury and denied such a request for, as in the case of a motion for acquittal, I felt obliged at that instant to consider the evidence from a standpoint most favorable to the Government's contentions and every piece of evidence in support of the indictment.

■ On a motion for a new trial on the grounds set out by the defense, the power of the court is much broader. If the court reaches the conclusion that a miscarriage of justice has resulted, the verdict should be set aside and a new trial granted.

If the judge sits as a thirteenth juror, as some authorities hold, then a verdict in which he could not concur should not stand if it is properly moved against. In any event he should act in preventing injustice when deliberated discretion prompts such act.

Of course, "justice" in jurisprudence is not a sentimental concept which each person may have as to right or wrong with relation to a given cause, or any duty he may have in connection with it, but is an impartial, fair and reasonable application of prescriptions of law both vengeful and protective.

When the verdict was announced I felt a shock, an uneasiness of conscience and self-censure that I had not more carefully and understandably instructed the jury as to the weight and degree of persuasiveness

necessary in finding first degree murder, or have withdrawn it from jury consideration. I then realized for the first time that there was a neglect to ask for or to give an instruction to the effect that if two equally reasonable and believable explanations were presented in evidence relating to essential elements of the crime, one explanation tending to prove the presence and the other with equal force the absence of the element, the jury was duty-bound to adopt the one tending to innocence of that element.

■ In considering the motion for a new trial I have disregarded all grounds advanced other than the weight and sufficiency of the evidence as a whole. The affidavits of two jurors were presented showing that they would not have joined in the verdict had they known it called for life imprisonment. These are disregarded because the law will not permit a verdict to be impeached by such facts. Nevertheless, jurors should never be placed in such a predicament, and when they are voting mandatory life imprisonment they should know that they are voting that, for there is no doubt but that it would often give pause to many persons and cause them to examine with extreme care the evidence with its relation to all the elements of the crime charged in the indictment if they knew they were imposing the penalty. No one should be encouraged or permitted to vote a specific conviction in a homicide case in the belief that the judge has authority to use his discretion in doing what he considers fair and just by way of sentence when he has no such discretion.

Many aspects of this homicide were spectacularly gruesome, as described by officers who visited the scene and by F. B. I. agents who gleaned somewhat disconnected and contradictory versions from the defendant as to what had occurred. An examining physician testified to a number of abrasions of the scalp and a small fracture of the skull. There was evidence of profuse bleeding. This could have resulted from nose bleeding, which is often caused by a blow on the forehead. The physician did not testify as to suffocation or indications of choking, although the indictment charged it.

Testimony showed that blood had run through the mattress on the bed and formed a pool on the floor. This could have resulted from nose bleeding which, as is well known, may be profuse following a concussion blow on the forehead. The sight, pictorial or descriptive, of a blood pool is often hideously repulsive to average persons and, in connection with homicide, adds to feelings of condemnation toward the person responsible for the killing. For this reason such pictures should not be admitted to jury view other than in exceptional cases.

Uncontradicted evidence showed that the defendant, about 22 years old at the time of the homicide, had been reared in a strictly religious and prudish-minded family until inducted into the Army in 1944; that he was pretty much tied to his mother's apron strings, which he did not resent; was fervently religious and neither smoked, drank or used profanity and was taught by his mother that sexual things were filthy; that at the age of 14 he was forcibly subjected to carnal copulation by a male stranger and was thereafter subjected to similar abuses several times before he left his home and was enlisted in the Army. He testified that these experiences created in him a very deep hatred for men who had such homosexual desires and were bent on enforcing them; that he wondered why he was a target for such men, and the thought of the thing not only infuriated and shamed him but kept him in constant fear of sudden assaults; that he served through his Army enlistment by rebuffing one or two approaches by soldiers and sailors; that upon the necessary intimate association with many men in the Army he adopted the customs and habits of many others and began drinking with them and enjoying their company, feeling that it was more manly to do so and cultivate an exterior of being rough and tough; neglected church, played cards, gambled, and liked it, believing he was growing into a stronger and more masculine personality, but all the time he carried a haunting fear of physical assault, which he could not overcome.

After his discharge from the Army in August, 1946 he took Civil Service employment at an Army post at Honolulu. He became acquainted with a Honolulu born girl, fell in love with her and married her in May 1948; they were happy in each other's company, but he had an irresistible impulse to frequently go out to barrooms and drink with the male habitues of such places, which were numerous; still he always felt a fear of personal safety and at different times purchased blackjacks or billies for his protection, once purchasing a revolver, which he delivered over to a bartender for safe keeping until he should leave to go home, but which the bartender promptly turned over to the bouncer, thence the police, and he was arrested and fined for possessing an unregistered firearm. His wife found one blackjack in his shirt while he was asleep and removed it and gave it to her sister for safe keeping. This was produced in court.

In his work at the Army Post as a clerical worker he fell in company, several months before the homicide, with the deceased, a fellow-worker who was 48 years old. The deceased became very friendly and patronizing, saying that he regarded the defendant as a son and fondled him as such. The friendship became mutual and warm and so continued, the elderly man holding great charm in the mind of the defendant. They never had but one disagreement; that followed from an escapade wherein the deceased persuaded the defendant to forego his work for a day and accompany him to a pleasure boat moored in a harbor several miles from the place where they worked, where they would have a day of drinking and cardplaying. The deceased furnished the liquor and they both became drunk and went to sleep in the cabin.

The following day the deceased told the defendant that he must have taken his purse, which he said was missing and contained about $60. The defendant denied that he had, but admitted that he had no memory of what had transpired as he was unconsciously drunk and, upon being told by the deceased he could settle it by paying him $60, otherwise he would turn the matter over to the police to solve, he willingly, partly in sympathy and partly in fearful repugnance of an investigation, agreed to pay $60 in installments.

On the evening of the day before the homicide, which was his bi-weekly pay day, he had dinner with his wife at a restaurant at Waikiki and intended to thereafter go to Fort Shafter to the room of deceased and pay him a second installment of $20, but when his bus arrived downtown at the transfer station it was raining heavily and he decided to defer the payment until the following evening after work.

The following morning he took $25 from his wife, to whom he habitually delivered all his wages, with the intent of paying the decedent, who was then not working on account of force reduction, but after walking several blocks from his home to the place where he would take a bus, he had an irresistible urge to cross the street to a saloon and have a drink of whiskey although he had not drank or cared for it since the escapade on the pleasure boat a few weeks before. The taste of whiskey created a desire for more he testified, and he had about three drinks in this barroom and then went to another where he had two or three drinks more, then he lost all intention of going to work and went to another barroom after an hour or so. He then went to a certain pawn shop and bought a blackjack, as he had done at the same place on two former occasions, and inquired about a revolver which he had long desired to own, thence to another saloon where he had more drinks and concluded that he would go and visit with his friend, the deceased, pay him a part of the $20 he had intended to pay after work hours that evening, play cards and have some drinks with him. Accordingly, he bought two one-half pints of whiskey and called at deceased's room about noon. He was cordially received, and he and deceased spent about three hours in playing cards and drinking about three-fourths of the liquor he had taken and some the deceased had on hand. The deceased became so intoxicated that he could not clearly read his cards and laid down on his bed which had been used as the card table in the narrow room, and a few minutes later suggested that if they could not play cards they might have fun and play at another enjoyable game. This remark fired a deep resentment in the somewhat stupefied mind

of the defendant and as he passed to the head of the bed and was in the act of pouring himself a drink of liquor the deceased reached up and grasped his privates. The defendant testified that this act, following deceased's remarks, threw him into an uncontrollable fit of fear and anger, as he said: "The deceased was a very good friend of mine and that was the last I hoped he would ever do to me"; that he was instantly obsessed by a passion to destroy the man whom he had respected and loved, his best friend, and he drew the blackjack from some place which he does not know and began beating the deceased on the head; that he had no control of his acts and it seemed to him that he stood apart in some other part of the room and saw himself striking the deceased, powerless to interfere, neither approving or disapproving.

He told F. B. I. investigators that after striking an unknown number of rapid blows he grabbed a pillow from the bed and put it over the deceased's face and sat on it, still the deceased's body struggled somewhat and moaned, and he believed he reached down and tried to choke him, although he testified that he did not know just what he did do but was distressed that it took so long to reduce the deceased to quietness. Then he must have sat down in a chair, for when he woke up some time later he was sitting in a chair with his head on the bed and his hands stretched across the body of the deceased who was then lying face down.

He had blood on his hands, arms and clothing. He went to the latrine and washed the blood from his body and returning to the room, clothed himself in trousers and shirt belonging to the deceased, and packed other of deceased's clothing and effects in deceased's suit case, leaving his own blood-stained clothes in the room at the head of the bed. He sat for a long time and tried to sober his mind and devise some way of hiding his crime, but it was useless. Then, about 4 o'clock, he took the deceased's purse and his blackjack and went out into an unfrequented part of the ground of the Fort, where it was swampy and a foot-bridge crossed a small stream. He took what money the

purse contained and threw the purse in the stream, throwing the blackjack, as he believes, into the swamp, and then went by bus to his home and told his wife some true or fanciful particulars of what had occurred. She advised him to go at once and inform the police so that they might go immediately to deceased's room as he might yet be alive and could be administered to. He then went to a barroom where he was acquainted and told the bouncer there that he believed he had killed a man and asked him to notify the police. This was done. A considerable delay ensued as the Honolulu police have no authority on a military reservation and had to get in contact with military police. Later the F. B. I. was called in and took charge of the investigation.

After beginning a somewhat fabricated false story a few hours later the defendant relented in shame of his falsehood and cooperated in every way, apparently, with true statements of all the facts and circumstances so far as he could remember occurrences; showing them where he had thrown the purse, which was found and put in evidence, and the blackjack, which has not been found.

His statements furnished the basis for the indictment and for the prosecution's case in the trial, the prosecution being in ignorance of the mitigating defense that was brought forward, and relied on defendant's statements to the F. B. I., which made corroborative evidence available as to some particulars.

The defendant took the witness stand and with apparent candor told of his whole life and of his relations with the deceased in minute particulars under examination and cross-examination covering several hours. He told of his longstanding deep respect and friendship for the deceased who had pretended and professed a father-like interest in him and whose companionship he liked better than any he had known, and of some shades of doubt and mistrust that had been creeping into his mind on account of a few recent instances, one being that the deceased frequently put his arm around him, which he did not like, and had recently solicited him to give up his home with his wife and take a room opposite the one occupied by deceased at the Fort Shafter housing barracks for civilians; yet, he was charmed with the companionship of the deceased.

In short, he did not know why he killed his friend, the deceased, for he was very fond of him, even though he was a braggart of his prowess and success as a "lady-killer".

A well-trained psychiatrist of long and large institutional experience testified at length in behalf of the defendant, classifying him as a passive, unconscious homosexual who was entirely ignorant of his latent propensities and said he was learning of them for the first time in his life in listening to the witness testify. As a brief summary of the substance of his testimony, he described the defendant's uncontrollable indignation in even being suspected of being approachable in a homosexual way, yet having an emphatic feeling that he was somewhat different and lacked some he-man attributes that he greatly yearned for; hated with intensity his sissified nature and fears, and had been struggling in every way that he thought effective to kill that something in him which he dreaded and hated, and which terrified him, without knowing what it was; his youthful experiences in being abused had left a deep hurt and scar in his inner consciousness which he kept secret and tried to forget, but couldn't; yet his inborn passiveness toward homosexuality made him a mark, and he was something akin to a moth fluttering around a flame, inviting danger but without any realization of the cause.

The witness summed up that when the defendant beat the deceased he was not actually conscious of killing a human, but was killing some ever-present but unknown and obscure thing inherent in himself, as one would kill a poisonous snake, and which he covertly and unconsciously hated with an inspired, pent-up hatred that knew no bounds, and was prompted and controlled at the time by his rebellious subconscious mind; that at the moment of killing he was in such an uncontrollable rage that he was no longer a rational person. That his psychopathic case is curable, if the sudden obsession of hatred is not already

permanently cured by this experience, by a six to twelve month proper treatment in a mental hospital. That the defendant is not a killer and would shrink from it in every possible way; that if he were faced with the alternative to either kill or submit to homosexuality, he would submit; that his conscious mind and psychological nature and reasoning lead in an entirely different direction than doing hurt to any one.

I have no thought of putting general approval on expressed opinion of psychiatric practitioners, for in my opinion there are numerous pseudo, pretentious but ignorant, doctors in the science, but the time has come when the judiciary must recognize psychiatry as a science, and not stand by in effect, as it once did not too long ago, allowing men who were, before and at the time of commission of crimes, helplessly controlled and obsessed by insane ideas and impulses, to be tried, convicted and punished for committing them.

When a well-trained, broad-experienced psychiatrist, reputable in his profession, makes a careful examination and gives persuasive and scientifically approved reasons for his conclusions in a given case, the judiciary should give respectful attention and consideration to such deductions and, while they may not be controlling, they should prompt additional thoughtful care in the consideration of surrounding facts.

Several court opinions greatly influenced me in arriving at my decision to set aside the verdict, as follows:

" * * * it is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right.

* * * * * *

"To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require." Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 122 F.2d 350, 352, 354.

In Applebaum v. United States, Circuit Court of Appeals for the Seventh Circuit, 274 F. 43, 46, the court stated: "If a defendant asks that a verdict be set aside because it is not supported by the required weight of evidence, his motion is addressed to the discretion of the trial judge. In order properly to exercise that discretion it is manifest that the trial judge, as well as the jurors, should attentively consider and weigh the evidence as it is being introduced, because in that respect he is sitting as the thirteenth juror. It is the exclusive and unassignable function of the trial judge to grant or refuse a new trial in cases of conflicting evidence."

In support of the motion for a new trial, counsel for defendant relied heavily upon the decision of Justice Holtzoff in United States v. Robinson, D.C.D.C., 71 F.Supp. 9, 12, in which the court, after a learned discussion, supported by numerous authorities, of the power of the federal district court judge to grant a new trial, concluded: "The foregoing discussion inescapably leads to the conclusion that a judge may set a verdict aside as contrary to the weight of evidence and grant a new trial, even if there was substantial evidence requiring him to submit the issues to the determination of a jury."

It is my conclusion that, giving full weight thereto, the verdict of the jury is not supported by sufficient substantial evidence that the killing of the deceased by the defendant was willful, deliberate, malicious and premeditated, and therefore the verdict is set aside as contrary to the weight of the evidence and a new trial granted.