UNITED STATES of America, Plaintiff,

v.

ALLIED ASPHALT PAVING COMPANY
et al., Defendants.

No. 77 CR 191.

United States District Court,
N. D. Illinois, E. D.

May 31, 1978.

Donald I. Baker, Ass't Atty. Gen., U.S. Dept. of Justice, John L. Burley, Richard Braun, U.S. Dept. of Justice, for plaintiff.

George J. Cotsirilos, William Barnett, Herbert Morton, Edward L. Foote, Chicago, Ill., for defendants.

## Memorandum

LEIGHTON, District Judge.

This is a prosecution by an indictment which in one count charged Allied Asphalt Company, Arcole Midwest Corporation, Brighton Building & Maintenance Company, Material Service Corporation, Robert R. Anderson Co., Thomas Bowler, and Gerald R. Nagel with conspiracy in violation of Section 1 of the Sherman Act;[1] and in ten other counts, with mail fraud.[2] Prior to trial, Allied Asphalt, Arcole Midwest, Brighton Building, and Thomas Bowler pled guilty to the Sherman Act count; the three corporations also pled guilty to one count of mail fraud. They were sentenced in accordance with their plea agreement.

Material Service, Anderson Company and Nagel went to trial before a jury; and at the close of all the evidence, they moved for judgments of acquittal. Arguments were heard, during which the court asked questions that probed whether there was evidence from which the jury could reasonably find that defendants' conduct had the anticompetitive effect on interstate commerce which violated Section 1 of the Sherman Act; and whether, from the evidence as a whole, the jury could reasonably find defendants guilty of the mail fraud counts. Counsel responded; but after an extended colloquy, the court stated that "ruling [on the motion] is reserved because [it] is not satisfied with the answers given to some of the questions * * *." Accordingly, the case was submitted to the jury under the procedure which allows ruling on a motion for acquittal at the close of all the evidence to be reserved until a jury returns a verdict, after it returns a verdict of guilty, or it is discharged without having returned a verdict. Rule 29(b), Fed.R.Crim.P.

The jury deliberated and acquitted the Anderson Company of all charges, acquitted Material Service and Nagel of the mail fraud counts, but convicted them of the count that charged violation of the Sherman Act. These two defendants have now filed a joint motion supported by a brief with appendix in which they ask this court to grant the motions for acquittal they made at the close of all the evidence, or acquit them after the jury's verdicts; or in the alternative, grant them a new trial or arrest the judgments.

The government opposes the motion with a supporting memorandum. Thus two issues are presented. 1. Whether at the close of all the evidence the court properly reserved its ruling on defendants' motions for acquittal and submitted the case to the jury. 2. Whether the court should now grant defendants' post-verdict motions for acquittal, or in the alternative, their motion for a new trial or in arrest of judgment.

1. 15 U.S.C. § 1.

2. 18 U.S.C. § 1341.

Resolution of these issues requires a detailed review of the evidence.[3]

## I.

O'Hare International Airport is owned and operated by the City of Chicago. It is part of a nationwide airport system from and to which aircraft move in this country. A substantial amount of the nation's industrial goods travel in interstate commerce through these airports by air transportation. The federal government and Chicago cooperate in financing the construction and repair of airports located within the city. This cooperation is governed by the Airport and Airway Development Act of 1970, 49 U.S.C. §§ 1701, *et seq.*, commonly known as the Airport Development Aid Program, or A.D.A.P. The Federal Aviation Administration is the agency that furnishes, in cooperation with the City of Chicago, portions of the funds needed to pay for construction and repair of airport runways at O'Hare.

Early in January 1975, Chicago applied to FAA for federal funds to overlay, groove and mark Runway 9L–27R at its airport, O'Hare International. The application was granted; and on May 9, 1975, the city and the federal government entered into an agreement by which half of the money needed for repair of the runway was to be paid from funds administered through A.D.A.P. Accordingly, on May 14, 1975, the city, using a newspaper of general circulation in Chicago and Champaign, Illinois, advertised that it was accepting bids for improvement of Runway 9L–27R at O'Hare. At the same time, it sent information concerning this project to 44 or more construction and road building contractors who, ordinarily, would be interested in the kind of work the city wanted done at its airport.

The information contained in the advertisements and in the bid papers which included terms of the contemplated agreements, plans and specifications, told prospective bidders the size and scope of the project, state and federal laws that controlled, and the fact that there was a strict 45-day limit for performance of the contract. Between the first day of the advertisement and the opening of sealed bids on May 29, 1975, at least 22 construction companies, either as prospective contractors or subcontractors, registered with the city, made the necessary deposits, and received information concerning the project. Among them were Arcole Midwest Corporation, Allied Asphalt Paving Company, Brighton Building & Maintenance Company, Material Service Corporation, Robert R. Anderson Co., Palumbo Excavating Co., J. M. Corbett Co., and the Madden Company.

At the time, Arcole Midwest was a company engaged in the business of earth moving, asphalt and concrete paving of highways, bridge and airport construction. Its president and chief executive officer was Ernest Bederman who was familiar with bidding for public contracts; and who had, in the past, done work for the City of Chicago at O'Hare. Bederman wanted to bid for the runway project. As soon as bid papers were available, he examined them, went to the site and decided that for many reasons, including the time limit requirement, the work had to be done by a joint venture. Among other things, Bederman knew that Allied Asphalt owned a plant that was located on land that adjoined O'Hare Airport. Because time and distance

---

**3.** For the government, this evidence consists of the testimony of ten witnesses, stipulations as to the testimony of four others, and 63 exhibits offered and received. For the defense, four witnesses testified, including defendant Gerald R. Nagel. In addition, one defense exhibit was received in evidence.

In making this review, the court bears in mind that "[t]he true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Williams*, 311 F.2d 721, 723 (7th Cir.) *cert. denied*, 374 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035 (1963), citing *Curley v. United States*, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947); 2 Wright, Federal Practice & Procedure: *Criminal* § 467 (1969).

were important factors in the completion of the O'Hare job, Bederman decided that Allied was the company with which he should form a joint venture for the runway project. From his knowledge of the work required and of the construction industry in the Chicago area, Bederman reviewed the companies he thought would compete with him for the contract. These were, in his appraisal of the situation, Brighton Building & Maintenance owned and operated by Thomas Bowler, Palumbo Excavating whose chief executive officer was Peter Palumbo, J. M. Corbett Co., and the Madden Company.

Bederman also knew that the Robert R. Anderson Company owned a controlling interest in Allied Asphalt Paving. He was acquainted with the fact that Anderson's president, Robert R. Anderson, was a director of Allied Asphalt and treated by many as an Allied vice-president. Bederman decided to talk with Anderson in his capacity as an Allied Asphalt official. They met at lunch soon after the city advertised for bids on the O'Hare job. They agreed to a joint venture by Arcole and Allied. In their conversation, Anderson told Bederman he understood that for $80,000.00, Thomas Bowler was willing to refrain from bidding the O'Hare job on behalf of Brighton Building. Bederman decided to meet with Bowler to confirm this fact. He did; and in a lunch the two had later, Bowler told Bederman that for $80,000.00 paid by delivery of asphalt tonnage to two companies he owned, he would not bid on the O'Hare project. Bederman consented to this arrangement; the agreement not to bid was formed. However, contrary to his representations to Bederman, Bowler was not competing for, nor had he any intention of bidding on the O'Hare job.

A few days later, Bederman met with Donald McLean, president of Allied Asphalt, to work out the details of the agreement by which Arcole and Allied were going to bid for the O'Hare contract. Toward this end, Bederman and McLean, utilizing the staffs of estimators of their two companies, gathered information that would enable them to prepare the bid they were going to submit to the city. While this was going on, Bederman contacted Peter Palumbo of Palumbo Excavating Company and urged him not to bid the O'Hare job. Palumbo, however, insisted he was going to do so. As to the Corbett and Madden companies, Bederman was not able to get any information concerning their intentions. But the Corbett Company, because of serious financial difficulties, was unable to bid for the job in question; its chief executive, James Corbett, was not interested in the O'Hare project. The Madden Company, other than taking out the bid papers, did not show any interest in getting the O'Hare contract.

Material Service Corporation was not a competitor in the bidding for the O'Hare job; it is not a construction company; it is a seller of sand, gravel, stone, and ready-mix concrete to contractors in the construction industry. Gerald R. Nagel was and still is its senior vice-president in charge of sales. His duties for Material Service required him to report to an executive vice-president of the company, Arnold Sobel. Material Service kept abreast of projects like the O'Hare runway repaving because it sold materials to construction companies that bid on such contracts. Nagel knew of the May 14, 1975 advertisements by the City of Chicago and of the bid letting date, May 29. He knew the officials and executive personnel of Arcole Midwest, Allied Asphalt, Anderson Company, Palumbo Excavating, and the Corbett-Madden companies. In fact, Arcole Midwest was a major Material Service customer. Allied Asphalt, however, did not buy any of its construction needs from Material Service. Palumbo, Corbett and Madden were also Material Service customers. A joint venture between Arcole Midwest and Allied Asphalt, compared with one formed from among the Palumbo-Corbett-Madden companies, meant that Material Service would sell a smaller quantity of its goods for the resurfacing of the O'Hare runway.

Between the time Bederman agreed to pay Bowler $80,000.00 in asphalt tonnage in return for his not bidding on the O'Hare

job, McLean of Allied Asphalt, and Anderson in his capacity as an Allied official, learned of this bid rigging arrangement and agreed with it.

Sometime during the afternoon of May 28, 1975, Bederman called Nagel. The purpose was to use Nagel's position as a Material Service executive in connection with Peter Palumbo and James Corbett who, he thought, were potential bidders for the O'Hare job the next day. Bederman asked Nagel if he could meet him in the Allied offices later in the afternoon. Nagel agreed to do so. Shortly after hearing from Bederman, Nagel telephoned Palumbo and asked him to come to Allied's offices. Late in the afternoon of May 28, Nagel arrived at Allied's. There he found Palumbo, McLean, Bederman and Robert R. Anderson. Palumbo and Bederman were engaged in a heated conversation about the ability of Palumbo Excavating Company to bid for the O'Hare contract. Palumbo insisted that his company had the capacity to compete for the O'Hare job; Bederman tried, unsuccessfully, to persuade him to the opposite view.

At the height of the verbal exchange, Palumbo left the meeting in what appeared to be an unfriendly frame of mind, insisting as he left that his company was going to bid on the O'Hare project the next day. Bederman asked Nagel to follow Palumbo and ask him if in fact he was going to bid for the job. Nagel followed Palumbo to a nearby parking lot and asked him. Palumbo responded by reminding Nagel that some two weeks before he had said that Palumbo Excavating Company was not going to bid on the O'Hare project, he emphasized the fact that he had no intention of bidding for the job. Nagel returned to the Allied offices and engaged in further conversation with McLean, Bederman and Anderson about the O'Hare project.

Later, he went to dinner with Bederman and McLean, during which they talked about the O'Hare job. From what he heard at the meeting, and what was told him at the dinner, Nagel learned that Bederman and McLean " * * * were putting the O'Hare job together * * * ''; this meant, in the colloquialism of the industry, that the two desired to get the job for their joint venture of Arcole Midwest and Allied Asphalt; and that they were concerned about the competition they expected at the bidding. Neither Bederman nor McLean asked Nagel to prevent anyone who wanted to bid the O'Hare job from doing so. Nagel was not told about the agreement Bederman had entered into with Bowler, nor about the $80,000.00 payoff. But in the course of the dinner, Bederman asked Nagel to communicate with Peter Palumbo and James Corbett and find out their intentions concerning the O'Hare job the next day. Late that evening, Nagel called Bederman at home and told him he had spoken with Palumbo and Corbett who assured him they were not going to bid. Bederman and McLean shared this information as they went through the last minute preparations assembling data for the bid they were going to make.

The following morning, May 29, 1975, in accordance with the bid advertisement, Arcole Midwest and Allied Asphalt Paving Company, as joint venturers, submitted a sealed bid to the City of Chicago in which they said that for the sum of $3,070,331.80, they would do the work required for the resurfacing and repaving of the city's O'Hare Runway 9L–27R. Theirs was the only bid; it was later accepted; thereafter, the contract was fully and satisfactorily performed by the joint venture, including compliance with the time limit for completion; and in the months that followed, the bid amount, plus approved overages, were paid by the city, part of the funds being furnished through the Airport Development Aid Program.

II.

The indictment that followed these events, supplemented by a voluntary bill of particulars, charges in Count One that commencing on or about May 14, 1975, the date on which the City of Chicago advertised for bids on the resurfacing of its O'Hare Runway 9L–27R, let by the city on May 29,

1975, Material Service, Gerald R. Nagel, the other defendants; and certain unindicted co-conspirators George B. Krug, Jr., Ernest A. Bederman, Victor V. Verdico, Harry R. Kunkle, Donald K. McLean, Robert R. Anderson, Peter A. Palumbo, James C. Corbett, Western Asphalt Paving Co., Union Contracting & Materials Co., Palumbo Excavating Co., and J. M. Corbett Co. together with others known and unknown to the grand jury, entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the resurfacing and repavement project on O'Hare Runway 9L–27R, in unreasonable restraint of the interstate trade and commerce connected with the operation of O'Hare International Airport, and in violation of Title 15 U.S.C., Section 1, commonly known as the Sherman Act. The alleged combination and conspiracy, it is charged, consisted of an agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which were:

 (a) To allocate to a joint venture of Arcole Midwest Corporation and Allied Asphalt Paving Company the A.D.A.P. project referred to in Count One of the indictment;

 (b) To submit a collusive, non-competitive and rigged bid to the City of Chicago in connection with the above-referenced project; and

 (c) To provide for the payment of consideration of value to certain defendants and co-conspirators who were not the low bidder on the above-referenced A.D.A.P. project.

It is charged, and the voluntary bill particularizes, that for the purpose of forming and effectuating the combination and conspiracy, defendants and co-conspirators discussed and had conversations in or about Chicago, Illinois during the two week period preceding May 29, 1975, agreed on the submission of their bid on the project in question, designated the successful low bidder; and in doing so, submitted a bid containing false, fictitious or fraudulent statements and entries. Then, during at least July and August 1975, the payment of consideration of value by Arcole Midwest to certain other

defendants and co-conspirators was accomplished by providing asphalt to Brighton Building & Maintenance Co. and the co-conspirators Western Asphalt Paving Co., Union Contracting & Materials Co.

Count Two realleged certain paragraphs of Count One and then charged that beginning sometime in or about May 1975, and continuing thereafter to an unknown date, Material Service, Nagel, the named defendants, and others known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud the City of Chicago and the United States of America of:

 (a) Money,

 (b) Their right to open and free competition in the awarding of contracts of airport runway construction pursuant to the Airport Development Aid Program, and

 (c) Their right to have the Airport Development Aid Program conducted honestly, fairly and free from craft, trickery, deceit, corruption, dishonesty, and fraud.

According to the charge, it was part of the scheme and artifice that:

 (a) A joint venture of Arcole Midwest Corporation and Allied Asphalt Paving Company would be and was allocated the resurfacing of Chicago's O'Hare International Airport Runway 9L–27R, let by the city on May 29, 1975;

 (b) A collusive, non-competitive and rigged bid would be and was submitted to the City of Chicago in connection with the project, and

 (c) Payment of consideration of value would be provided to certain defendants or co-conspirators who were not designated as low bidder for the project.

Then, it is charged that on or about July 18, 1975, in this district, Material Service, Nagel and the other defendants, for the purpose of executing the scheme and artifice to defraud, and attempting so to do, did knowingly cause to be delivered by mail,

through the United States Postal Service, a certain envelope containing two checks dated July 24, 1975, issued by the City of Chicago, payable to the joint venture and addressed to it at Evanston, Illinois, in violation of Title 18, U.S.C. § 1341. In nine other counts that followed, each mailing of checks to the joint venture was charged as a separate offense against the United States, each alleged to be a violation of the mail fraud statute.

### III.

Defendants' motions for acquittal which they made at the close of all the evidence presented questions concerning sufficiency of the evidence to convict them of these charges. *United States v. Perplies,* 165 F.2d 874, 876 (7th Cir. 1948). And in answering these questions, the test to be applied is whether at the time of the motions there was relevant evidence from which the jury could reasonably have found defendants guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government. *United States v. Figueroa-Paz,* 468 F.2d 1055, 1058 (9th Cir. 1972); *United States v. Cockerill,* 366 F.Supp. 856 (S.D.Ill.1973).

### A.

Applying this test first to the mail fraud charges, it appeared at the close of all the evidence that when Bederman called Nagel during the afternoon of May 28, 1975, it was the first time the two had discussed the O'Hare runway project. Bederman and Nagel were business acquaintances. Arcole Midwest, Bederman's company, was a major customer of Material Service Corporation; Nagel's work as vice-president in charge of sales for Material Service brought him in touch with men like Bederman. Nothing in the evidence suggested that Nagel knew Bederman as other than a reputable, hardnosed businessman who was engaged as an executive of a large construction company. There was nothing from which the jury could infer that the May 28 telephone call was other than a legitimate business contact.

The evidence also showed that Nagel was acquainted with Peter Palumbo, president of Palumbo Excavating Company. He also knew James Corbett, president of J. M. Corbett Company. Bederman knew these facts. From the fact that soon after hearing from Bederman Nagel called Palumbo, the jury could reasonably have inferred that in the telephone conversation between them Bederman told Nagel of his attempt to convince Palumbo that Palumbo Excavating Company could not do the O'Hare job. There were reasons for Bederman's contention; the factors of distance, economic resources and the contract time limitations, lent reasonableness to his position. Moreover, Nagel knew Bederman as a successful executive of a construction company that had for a long time bid for public contracts in the state of Illinois. Nagel as an experienced businessman knew that no construction company executive will devote time and money preparing to bid for a public job and not seek information concerning potential bidders with whom he had to compete. The jury could not have reasonably given any other construction to this evidence.

Nagel went to the offices of Allied Asphalt Company late in the afternoon of May 28, 1975. Palumbo, whom he had called, was there. Nagel heard the exchange between Palumbo and Bederman about the capacity of Palumbo's company to bid for the O'Hare contract. There he saw McLean and Anderson whom he knew was an executive of Allied. Later that evening he went to dinner with Bederman and McLean. The jury could have reasonably concluded that at the meeting and from what he was told at the dinner Nagel learned of Bederman's interest in the O'Hare contract; that Bederman and McLean were engaged in preparing to bid for the project; and that they were concerned about competition the next day when they submitted their bid for the O'Hare job. It is not a scheme and artifice to defraud for prudent businessmen, preparing to bid for a public contract, to take into account information about those who may compete against them. Bederman's

interest in Palumbo and Corbett, even if it had been accompanied with expressions of a desire that they not compete the next day, could not have told Nagel that a scheme and artifice to defraud either the City of Chicago or the United States of America was the object of either the meeting or the dinner engagement. Both Bederman and McLean, testifying for the government, told the jury that they never would have broached with Nagel the subject of the agreement they had formed with Bowler and the $80,000.00 payoff for which Bowler had agreed not to compete for the O'Hare job. Therefore, neither the telephone call he had with Bederman earlier, the meeting at Allied's offices, nor the conversation during dinner, gave Nagel any knowledge of a scheme or artifice to defraud on the part of Bederman and McLean.

It is well known in the federal law of crimes that the two necessary elements of the offense of mail fraud are (1) formation of a scheme with intent to defraud, and (2) use of the mails in furtherance of that scheme. *United States v. Keane,* 522 F.2d 534, 544 (7th Cir. 1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Shavin,* 287 F.2d 647, 649–50 (7th Cir. 1961). In a scheme to defraud, within the meaning of the mail fraud statute, the significant fact is the intent and purpose. *Fournier v. United States,* 58 F.2d 3, 5 (7th Cir.), *cert. denied,* 286 U.S. 565, 52 S.Ct. 647, 76 L.Ed. 1297 (1932). Where there are multiple defendants, the evidence must show beyond a reasonable doubt, with respect to a defendant, before he can be convicted, that he personally was a party to the scheme, and that he specifically intended to defraud; that is, he intended to act in a wicked manner. *United States v. Interstate Engineering Corporation,* 288 F.Supp. 402, 408 (D.N.H.1967); compare *United States v. Jones,* 380 F.Supp. 343 (D.N.J.1974). A defendant who does not know of a scheme and artifice to defraud cannot be convicted of having participated in such a scheme in violation of the mail fraud statute. *Mazurosky v. United States,* 100 F.2d 958 (9th Cir. 1939); compare *United States v. Browne,* 225 F.2d 751 (7th Cir. 1955).

In this case, Nagel did not know of any scheme and artifice to defraud; Material Service Corporation, under these circumstances, could not be charged with such knowledge. For this reason, at the close of all the evidence the jury could not have reasonably found defendants guilty beyond a reasonable doubt of any of the counts that charged them with mail fraud. In fact, the jury's verdicts acquitting them of all the mail fraud charges are consistent with this appraisal of the evidence. Therefore, at least as to ten counts of this eleven count indictment, defendants' motions for acquittal should have been sustained. The remaining question is whether this court should have gone further and sustained their motions for acquittal as to the count that charged them with violation of the Sherman Act.

### B.

In approaching the answer to this question, and at the same time resolution of the first issue presented, this Court must look at the indictment, its allegations, the bill of particulars voluntarily filed by the government, and the evidence. The basic purpose of an indictment or information is to clearly apprise a defendant of the charges and what he must be prepared to meet. *United States v. Tye,* 519 F.2d 586, 589 (10th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 306 (1975).

As to a bill of particulars, when it has been furnished, the government is limited to the details it specifies. *United States v. Haskins,* 345 F.2d 111, 114 (6th Cir. 1965). The function of a bill of particulars is to enable an accused to prepare for trial, prevent surprise, and to this end the Government is strictly limited to proving what it has set forth in it. *United States v. Murray,* 297 F.2d 812, 819 (2d Cir.), *cert. denied,* 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962). Whether or not in a Sherman Act case like this one the government need file a bill of particulars, having filed one in response to a motion, defendants are enti-

tled to rely on it until it is validly amended. *United States v. Flom,* 558 F.2d 1179, 1185 (5th Cir. 1977).

Subdivision II of this memorandum sets forth the charging paragraph of the indictment in this case. In it, the government alleges that the combination and conspiracy into which Material Service and Nagel entered was an agreement, understanding and concert of action with the other defendants, and the co-conspirators, to allocate the O'Hare Runway project to the joint venture of Arcole Midwest and Allied Asphalt Paving Company; to submit a collusive, noncompetitive and rigged bid to the City of Chicago in connection with the project; and, to pay consideration of value to certain defendants or co-conspirators who were not designated to be the low bidder on May 29, 1975 when the sealed bids were to be opened by the City of Chicago. The bill of particulars detailed who were the unindicted co-conspirators. These included Peter Palumbo and his excavating company, James Corbett and his company. In detailing how Material Service, Nagel, and the others, conspired to violate the Sherman Act, the bill of particulars told them they did this by the submission of a rigged bid to the City of Chicago, achieved by payment of consideration to certain defendants and co-conspirators who agreed to refrain from submitting bids, intending that the O'Hare Runway project would be awarded as it had been allocated by them. This being the charge, the Government was closely and effectually confined to the proof of the particulars it had specified. *United States v. Neff,* 212 F.2d 297, 309 (3d Cir. 1954); *United States v. Armco Steel Corporation,* 255 F.Supp. 841, 846 (S.D.Cal.1966); *United States v. Yarus,* 198 F.Supp. 425, 428 (S.D. N.Y.1961).

Looking at the proof to see if it was thus confined, it appears to have been established at the close of all the evidence that after the advertisement for bids on May 14, 1975, Bederman, McLean, and Anderson formed a conspiracy to rig the bid that the joint venture of Arcole Midwest and Allied Asphalt was going to make to the City of Chicago for its O'Hare Runway project. They were going to accomplish this by entering into agreements with potential competitors by which in return for payments of money they would refrain from bidding for the O'Hare contract. The object of the conspiracy was allocation of the O'Hare project to the joint venture; but the means by which the object was to be achieved was, as charged by the Government, the payment of money to potential competitors so that the bid would be rigged and the allocation made. The most important manifestation of this conspiracy was the agreement with Bowler and the $80,000.00 payoff in asphalt tonnage. No one could have known of this conspiracy if he did not know of the intended payoffs, particularly the one to Bowler.

 O'Hare Airport, where the runway in question is located, is an integral part of the system of national air transportation through which substantial amounts of the nation's goods move in interstate commerce. The construction, repairing and resurfacing of runways at O'Hare, since these runways are involved in the movement of goods by air transportation through it, at least affect interstate commerce. The allegations of the indictment in this case proceed on this theory.[4] It is

---

4. During the trial, however, it was insisted by the Government that some of the defendants in this case were engaged in interstate commerce because they were repairing and resurfacing runways at O'Hare International Airport, a transportation facility through which substantial amounts of the nation's goods move in interstate commerce. They rely on two United States Supreme Court decisions under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq. Overstreet v. North Shore Corp.,* 318 U.S. 125, 130, 63 S.Ct. 494, 87 L.Ed. 656 (1943), and *Alstate Construction Co. v. Durkin,* 345 U.S. 13, 16, 73 S.Ct. 565, 97 L.Ed. 745 (1953).

This court has given serious consideration to this point and concludes that it is not necessary to decide whether an Illinois corporation that engages in constructing, resurfacing, and repairing of runways at O'Hare International Airport is engaged in interstate commerce, or is engaged in intrastate commerce that affects interstate commerce, since the court's views as to the criminal liability, or lack thereof, of the various parties remain the same in either case. Compare *United States v. Bensinger Company,* 430 F.2d 584, 588 (8th Cir. 1970).

clear, therefore, that the contract allocation scheme in which Bederman and his co-conspirators were engaged was in violation of Section 1 of the Sherman Act. See *United States v. Flom,* 558 F.2d at 1183. A conspiracy among firms by which they agree to submit collusive, non-competitive rigged bids in interstate commerce is a *per se* violation of the Sherman Act. *United States v. Finis P. Ernest, Inc.,* 509 F.2d 1256 (7th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 and 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). An agreement that one company will not submit a lower bid than another is price fixing of the simplest kind; and if it is done by a company engaged in interstate commerce, it is a *per se* violation of the act. *United States v. Bensinger Co.,* 430 F.2d at 589. And there is no question that an agreement to allocate customers, rig bids and coerce others to join a conspiracy to that end violates Section 1 of the Sherman Act. See *United States v. Pennsylvania Refuse Removal Association,* 357 F.2d 806 (3d Cir.), *cert. denied,* 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966). Therefore, it is plain that Bederman, McLean, Anderson and Bowler, together with their respective companies, were engaged in a conspiracy in violation of Section 1 of the Sherman Act.

Information about this conspiracy, however, was never conveyed to Nagel, and as a consequence, was never transmitted to Material Service Corporation. Bederman's phone call to Nagel during the afternoon of May 28, 1975, one day before the bids on the O'Hare contract were to be opened, was the first time a contact was made with Nagel by any member of the conspiracy. In that telephone conversation, Nagel was not told what had transpired among the conspirators since the date of the bid advertisement. Bederman's request that Nagel assist him in convincing Palumbo that his company could not bid on the O'Hare job did not tell Nagel of the conspiracy. When Nagel arrived at the offices of Allied Asphalt, there heard the exchange between Palumbo and Bederman, and later participated in further conversation concerning the O'Hare project, he was not told of the agreement with Bowler, about the $80,000.00 payoff, or any conspiracy to pay money to others in consideration for their not bidding the next day on the O'Hare job. Later in the evening when Nagel had dinner with Bederman and McLean, he was never told the details of any conspiracy, or indeed that one existed.

■■■ A co-conspirator's liability as a participant in a conspiracy does not depend on his awareness of the total membership or the full extent of the conspiracy, so long as he understands and agrees to its common object, and accordingly acts in furtherance of some conspiratorial purpose. *United States v. Bastone,* 526 F.2d 971, 981 (7th Cir. 1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976); *United States v. Lawson,* 507 F.2d 433, 439 (7th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). In anti-trust cases, the requisite agreement may not be express, and mere knowing acquiescence can be culpable. *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Moreover, such consensual accord need not be shown directly, but can be inferred from indirect and circumstantial evidence. *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); L. Sullivan, Anti-Trust 314–22 (1977).

■■ Although a person can be convicted as a co-conspirator for mere acquiescence without express agreement, he must be found to have known of the conspiracy. "[O]ne does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." *Direct Sales Co. v. United States,* 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943). The cases do not provide a clear standard as to what kind

and degree of knowledge will support the inference of culpable agreement by mere acquiescence. Compare *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) with *People v. Lauria,* 251 Cal. App.2d 471, 59 Cal.Rptr. 628 (1967); La-Fave & Scott, Criminal Law 466–68 (1972). However, the knowledge shown must support the inference of an agreement; courts have not dispensed with the requirement that agreement be proved.

A case in point is *United States v. Anderson,* 542 F.2d 428 (7th Cir. 1976), where the Government proved that one defendant was an associate of others who had been convicted, had knowledge of their illegal activities, and was even interested in the success of the conspiracy. Yet the court concluded that "[t]he record merely reflects that Crews was a friend of Anderson who regularly placed bets with him. Moreover, we are convinced that the conspiracy conviction cannot stand. There was no evidence that Crews intended to join the conspiracy or committed any acts in furtherance thereof. The fact that Crews wished the Anderson-Traube venture to succeed so that he could place bets with Anderson was not enough to make him a conspirator." 542 F.2d at 436.

The Government argues that in this case Nagel entered into the conspiracy by agreeing, at Bederman's request, to find out whether Palumbo and Corbett were going to bid for the O'Hare contract; and that the agreement to get the information was itself a violation of Section 1 of the Sherman Act. However, in this court's view, the argument lacks both logic and merit. Nagel's willingness to learn from Palumbo and Corbett whether they were going to bid the next day cannot be construed as an agreement to help the conspirators reach an illegal accord. No citation has been furnished, nor has this court's research discovered, any authority for the Government's proposition. Instead, this court has found United States Supreme Court decisions which hold that the exchange of information, even as to prices, is not proof of a conspiracy to violate the Sherman Act. *United States v. Citizens*

*and Southern National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); *Cement Manufacturers Protective Ass'n v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925); *Maple Flooring Manufacturers Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). The test is not whether a criminal anti-trust defendant obtains information about potential bidders; it is whether "the exchange of price information has had an anticompetitive effect [on] the industry, chilling the vigor of price competition." *United States v. Container Corp. of America,* 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969).

Ignoring the question whether this standard is applicable to the exchange of non-price information, this court concludes that the evidence at the time defendants moved for acquittal did not establish any anti-competitive effect from Nagel's inquiry of Palumbo and Corbett concerning their intentions. Clearly, and a reasonable jury could not find otherwise, Palumbo and Corbett were not deterred from submitting bids to the City of Chicago for the O'Hare contract. Contrary to the Government's post-trial argument, the fact that Palumbo and Corbett later joined in a venture and performed a similar runway construction job on a bid let in September 1975 does not support the inference that they were individually able and desirous of bidding on the May 29 O'Hare contract.

Therefore, this court concludes that at the close of all the evidence, when defendants moved for judgments of acquittal, it improperly reserved its ruling on those motions and submitted the case to the jury. It should have been clear that even giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact, a reasonable mind could not have concluded that defendants Material Service and Nagel were guilty beyond a reasonable doubt of having entered into a conspiracy to violate the Sherman Act. For these reasons, the court should have granted defendants' motions for acquittal, not only as to the mail fraud

counts of which the jury acquitted them, but as to the count that charged them with violation of the Sherman Act. Accordingly, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, this court now grants the motions for acquittal made at the close of all the evidence and orders Material Service Corporation and Gerald R. Nagel acquitted and discharged from these proceedings. This ruling obviates the necessity of discussing the remaining issue or any of defendants' post-verdict motions, except their alternative motion for a new trial. This is so because the right of defendants to a new trial, had this Court not ordered their acquittal as of the close of all the evidence, touches on the viability of the verdicts in this case.

## IV.

Defendants, as an alternative, to their post-verdict motions for acquittal, move this court to grant them a new trial on the ground that joinder of mail fraud charges with the Sherman Act count resulted in the jury considering unfair, inflammatory, and prejudicial evidence regarding payoffs, frauds, false affidavits, and prosecutorial argument that analogized this case with the offense of burglary. They argue that the clearly frivolous mail fraud counts prejudiced the jury against them, poisoned their minds to the extent that they compromised in reaching the verdict that defendants were guilty of violating the Sherman Act. Defendants point to arguments by government attorneys concerning the mail fraud charges which they contend prejudiced their rights to a fair and impartial trial on the issues in the Sherman Act charge. The Government answers these arguments with one of its own in which it contends that there is no basis in this record for the grant of a new trial.

██ The federal rule governing grants of new trials recognizes the traditional principle that a trial court has broad powers in granting this form of relief if, for any reason, it concludes that the trial has resulted in a miscarriage of justice. *United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970); see *United States v. Parelius,* 83 F.Supp. 617, 618 (D.Haw.1949); Rule 33, Fed.R.Crim.P.

The phrase "miscarriage of justice" has no hard or fast definition; but in an important state jurisdiction where the concept is a constitutional standard for determining reversible error, it has been construed to mean that an error which occurs when it is reasonably probable that a more favorable result would have been reached for the accused had it not been for the error. See *People v. Lopez,* 251 Cal.App.2d 918, 60 Cal.Rptr. 72, 76 (1967); *People v. Allen,* 220 Cal.App.2d 796, 34 Cal.Rptr. 106, 109 (1963). Applying this reasoning to the case at bar, it is clear that had Material Service and Nagel been subjected to a trial before a jury that heard evidence only of their alleged entry into the conspiracy with Bederman, rather than evidence of the highly esoteric and sophisticated claim of criminal liability that underlay the mail fraud charges, it is reasonably probable that a result more favorable to them would have been reached by such a jury. Therefore, had this court not granted defendants' motions for acquittal, it would have granted their alternative motion for a new trial because the conclusion is inescapable that the verdicts in this case are miscarriages of justice.

So ordered.